video. Thank you, Erin. The source of the district court's error in this case, I think, can be found in the fact that nowhere in the district court's opinion is there any discussion or identification of the characteristics of the person who is skilled in the art of the invention. There's no dispute about what the minimum characteristics of that person could be. And the reason I emphasize the characteristics of the person who is skilled in the art is because if we look through the eyes of the person who is skilled in the art, if we stand in their shoes, as this court requires us to do, it makes it much less confusing as to why this patent claim should be correctly understood as being stated in terms of a range of orders of magnitude. You want us to know, based on testimony from one skilled in the art, 10 to the 4 is not the same as 1 times 10 to the 4. I certainly do. That's basically the position. Absolutely. And the reason why that is the proper construction, and is the plain meaning, not only the plain meaning of the term, but the proper construction, is because one skilled in the art knows several things about this technology. First, they know that it is extremely difficult to accurately control the dosing of these small amounts of halogen in these kind of claims. You do have a range in the claim. 10 to the minus 6 times 10 to the minus 4, which is a range of 100. And I looked at interesting, this is an interesting specification. They usually contain examples. Not example 1, example 2, lamp 1 and lamp 2. Each one of them has the same amount of bromide. And they all hit right in the middle. 10 to the minus 4 to 10 to the minus 6. They're all 10 to the minus 5. So the indefiniteness is already encompassed by your range. I would say two things to that, George. First, it is agreed by the expert for Iwasaki and the expert for Phillips that the definition of the end point of 10 to the minus 4 is well understood by those people who work in this field of discharged lamps, and in particular, the halogen transfer. Both Dr. Berg and Dr. Devonshire were quite clear that in discerning the amount of halogen in a lamp, that there is a boundary between, for example, 10 to the minus 7 and 10 to the minus 8. And both experts agreed with each other that that boundary is halfway between. And they also agreed with each other that because this is a logarithmic scale, that boundary ends at 3. So the order of magnitude range, as stated in the patent, has a clear end point. One skilled ER understands that end point is at 3 times 10 to the minus 4 on the higher end. That is the boundary that is understood. And that also differentiates it clearly from the prior art of Holmes, which starts at 5 times 10 to the minus 4. The other thing that someone skilled in the art understands, I'm sorry, you're also asking about the three lamp examples. Understanding those lamp examples, I think, would be helpful if you understood two other parts of the specification. The first appears on page 837 of the record. It is the patent of column 2. In particular, lines 35 and 38. And what that part of the specification describes is how you get the halogen in the lamp. And what it says is that efficaciously, in these high-pressure discharge lamps, the halogen uses bromine. It's introduced into the lamp in the form of CH2Br2. And here's the important part. At a filling pressure of about 0.1 millibars. What that tells someone skilled in the art, and of course what they already know, is that you are filling these lamps in the form of a gas, because the amounts are too small to use a solid, and it's at about 0.1 millibars. If you fill a lamp with about 0.15 millibars, you're not going to hit 1 times 10 to the minus 5 on the nodes. If you're using about 0.1 millibars, you're going to get something in the range of 10 to the minus 5. The lamp examples hold the halogen range constant in the patent, and they vary the pressure. Because the other aspect of the invention had to do with the quality of light, which was greatly influenced by the pressure of the lamp. I think that's why. What you're saying is you're entitled to an equivalence determination. No, Your Honor, we're entitled to literal infringement for the range that ends at 10 to the minus 4. Are you giving up your equivalence argument? Giving it up?  I know, Your Honor, hopefully I'm on both. There was an interesting colloquy in the district court about the distinction between claim construction and infringement, and in terms of rounding up numbers. So if you say, for example, 1 times 10 to the minus 6, it may be different from 1.0 times 10 to the minus 6, because 1.0 indicates that you take into account that you're looking at numbers to the tenths, whereas 1 times 10 to the minus 6 rounds out the numbers so that we can argue that 1 times 10 to the minus 6 might include literally 1.05, simply because of rounding. And then the question is, well, what does that mean? Is that a question of claim construction, or is it a question of infringement? If you look at the claim that simply says 10 to the minus 6, if you say that's the same as 1 times 10 to the minus 6, then does that mean that the claim is construed as literally that rounded number, which then might literally read on 1.05 times 10 to the minus 6? But I think it's a little esoteric here, but I think it's an important issue in this case because I know there was this colloquy, and there was a concession with respect to rounding as it applied to claim construction. Where was that left from your perspective? I think I can clarify that in the following way. I want to separate out the idea of rounding from the idea of literal infringement under the order of magnitude. Rounding came up because the district court decided to, in our words, rewrite the claim by putting a 1 in front of this order of magnitude and made it 1 times 10 to the minus 4 on the top end. In light of that claim construction, we then asserted infringement. The question is, do you have a product, and you test it, and you run it through the analysis, and it comes up with 1.3 times 10 to the minus 4. Is that, to one skill in the art, the same as 1? Because it's not 1.0, it's 1. And there we introduced extrinsic evidence saying that people in this art, in comparing a specification against an actual test result, will always round to the level of precision of the specification. And that's where the rounding argument came up. And so we asserted that even if we were wrong on the claim construction, that the jury would be entitled to hear evidence that rounding is commonly employed and that the significant  That's rounding. I think that is separate to state from the question of, what is the end point of the order of magnitude? What is the literal end point of the claim that's written? Because that doesn't involve rounding. It doesn't involve about. It doesn't involve approximation. What both experts agreed is that in discharge lamp technology, when you're talking about the halogen transport cycle, and people talk about these levels of halogen all the time in terms of orders of magnitude, that the difference between 10 to the minus 8 and 10 to the minus 9, for example, or any other two, is well understood and agreed. And there was never a dispute between Dr. Bergman or Dr. Devonshire on where that line was. So what do you mean, halfway in between? Halfway in between. Then you're up against Breyer-Arndt, aren't you? If you go halfway in between. No, Your Honor, I don't think we are. Halfway in between, as Dr. Devonshire and Dr. Bergman both agreed, because it's a logarithm scale, ends at 3 times 10 to the exponent. They're both agreeing on that, and I think that's commonly accepted by both sides. So you read 3 as going up to 3 1⁄2, and you read 4 as going down to 3 1⁄2, and there you are? Sorry, Your Honor, I didn't follow the question. You're saying Breyer-Arndt goes up to 10 to the minus 3. Breyer-Arndt starts at 5 times 10 to the minus 4. Our range would end at 3 times 10 to the minus 4. So, okay, so you would round the 3 to 10 to the minus 4 to 4 to 10 to the minus 4, or 3 to 10 to the minus 3? We would round it down, Your Honor, because they're negatives. So in this case, because it's, in our example, 3 times 10 to the minus 4 is the upper end of the range, that would round down to 10 to the minus 4. If you were at 5 times 10 to the minus 4, because it's a negative, that rounds up to 10 to the minus 3. Your claim says 10 to the minus 4. Absolutely. And to one skilled in the art, the question is, what is the boundary of 10 to the minus 4? What does 10 to the minus 4 mean? If you put it on a number line, where 1 times 10 to the minus 4 is clear, that's that one point. Where's 1.0 times 10 to the minus 4? That's a narrower place on the number line. Where's 1.00 times 10 to the minus 4? Obviously a narrower point again. Orders of magnitude, however, are broader points on the number line. Because in this art, when you're dealing with halogen concentrations this small, in these types of bulbs, the best the scientists were able to do at that time was to say, 10 to the minus 4 works. 10 to the minus 3 is too much. 10 to the minus 7 is too little. But we are confident that between 10 to the minus 4 and 10 to the minus 6, you will get an extraordinary lamp. And that's exactly true. And that's exactly the way in which both Phillips and Iwasaki make their lamps. And they are extraordinary. And it's because someone skilled in the art knows, for example, that the halogen concentration dosage, for example, doesn't have the ability to be tightly controlled. And I think there's an important reason why. We know it's a gas. And in order to fill it into this vessel, what you have to do, commonly, is you take one end of the lamp, after you've filled it with the gas, you dip it in liquid nitrogen, you cool it, and you hope that as much of that gas as possible condenses towards one end, and then you use heat to seal the other end. That process inherently creates an uncertainty. Even though you've dosed it with theoretically a certain amount of halogen, how much actually results is quite uncertain. The second thing that someone skilled in the art knows is the halogen transport cycle doesn't have... That sort of runs counter to the idea that claimants are precise. I mean, you can't say, well, they're infringing even though they're outside my claim because the whole process is uncertain. I mean, you don't want your claim to be invalid for under 112, too, for lack of definiteness. So you have to assume that 10 to the minus 4, 10 to the minus 6, is really the... It doesn't even say about. It says between the two. So you have to accept them. They're outside of it. We have to accept that 10 to the minus 4 is a limit. But the reason 10 to the minus 4 should not be rewritten as 1 times 10 to the minus 4 is because one skilled in the art knows that 10 to the minus 4 is an accurate statement of what the level of scientific knowledge was at the time as to what the top end of that range would be. Well, you're rewriting the claim not as... You say, don't rewrite it as 1 times 10 to the minus 4. Rewrite it as order of magnitude 10 to the minus 4. But the claim simply says 10 to the minus 4. That's all it says. The claim only says 10 to the minus 4. And the question is, which is to one skilled in the art... 1 times 10 to the minus 4, just as a mathematical statement. I think if the district court had said, well, it's 1.0 times 10 to the minus 4, maybe that would be different because that injects this order of magnitude limitation. But 1 times 10 to the minus 4 is literally what it says. What did the court say? 1 under 10,000? Yes. Your Honor, if we ask what one skilled in the art sees when they see this claim, the best evidence before the district court was the testimony of Dr. Bergman for Iwasaki and the testimony of Dr. Deventer for Phillips. And Dr. Bergman's testimony is in the record at around 8376 to 8377. And what you read Dr. Bergman as saying is that one skilled in the art if they wanted to express a range in terms of orders of magnitude would write it just this way as 10 to the minus 4. And in order to change that you have to rewrite it in his words, you have to put a 1 in front of it. And so I believe that the best evidence before the district court is correct that the range as written to a lab scientist is written as an order of magnitude and in order to change that you have to put, quote, a 1 in front of it. We'll save the rest of your time. Thank you. Good morning Your Honor. We rely primarily on Judge Castell's thoughtful and thorough opinions in support of his partial judgment in this case finding of infringement. And the purpose of being here is for a de novo review on the Clinton construction issue. We understand that. What's your answer to the argument that there's a difference between 10 to the minus 4 and putting some integer in front of it without a decimal point like 1.0? We disagreed with that in the district court and Judge Castell I think agreed with us. The portion of Dr. Bergman, our expert's testimony that my friend Mr. Riceburg has just been referring to was a hypothetical discussion. Dr. Bergman also said that in the context of this claim it's talking about being between 10 to the minus 4 and 10 to the minus 6 and he saw those as limits and both of the experts agreed that numerically and also Dr. Lye who is another expert who was offered by Phillips, they all agreed that 10 to the minus 4 means the same as 1 divided by 10,000. But what about equivalence? He said that a numerical range doesn't precludes equivalence. That's wrong, isn't it? I don't think maybe he did say that, but I don't think that's what he said or meant, Your Honor. A Supreme Court case Hilton Davis obviously showed the fallacy at that point but didn't Judge Lye, Your Honor, from that point dismiss equivalence? Well, I think the issue here was that we were making a all limitations rule argument with respect to the doctrine of equivalence and if I may back up for just a moment we had this very peculiar thing that in Act 1 in the claim interpretation stage they argued rounding is a matter of an order of magnitude as an interpretation. When that wasn't accepted they essentially waived any argument at the summary judgment hearing where Judge Costello specifically asked, he said, can I modify if you want me to consider modifying my claim interpretation? Phillips at that point opted not to ask him to modify and Judge Costello in fact pointed to the Key Pharmaceuticals case in his opinion and said essentially well that issue is abandoned. So when Would you come to the question as to how the all limitations rule or all elements rule is violated by the numbers in the context of Hilton Davis? Yes, Your Honor. I believe that in the context of this claim in contrast to Hilton Davis which was an about or words of approximation claim, first of all had the critical limit is 10 to the minus 4 not about or approximately. Second of all, the claim language in this case specifies between 10 to the minus 4 and 10 to the minus 6. Thirdly, as was referred to a short while earlier, there is the indefiniteness already built into the range. The only examples in the patent are 10 to the minus 6. Yes, Your Honor. I am going to defend the use of the all limitations rule. We come to cases that such as the Abbott case which was cited by Mr. Weisberg and Phillips in which they said that there was a doctrine of equivalence and it was not limited by the language of the claim. They said that if you have a range without something more, something to that effect. In this case, there was something more. When you look in the prosecution file, you see that in the very application itself, they acknowledge the Phillips' own Holmes patents and the examiner cited one and the applicant described a counterpart in the case with this 5 times 10 to the minus 4. So there is a reason why they put a specific limitation in this claim. So I submit, Your Honor, that they having put in the limitation that we fall into the circumstances such as is described in the Sage case. Did prior art include the application of equivalence? Was it a Holmes patent? We didn't primarily rely on that. The Holmes patent and the Japanese patent were greatly discussed in the claim interpretation stage. In the summary judgment, we primarily relied on the all limitations rule and we said that the presence of the Holmes patent references in the original application provided the reason for not expanding the claim language. That the reason was that it was clear that the applicant had written a claim to have a precise range. The range was 10 above and 10 below any examples that were found in the patent and for these combination of reasons we felt that it would vitiate the existence of a limitation. I think we should understand going in that before this patent application was filed, before the priority application was filed, it was known to make mercury vapor lamps with no halogen at all. What does Holmes describe? 5 times 10 to the minus 4? I believe that that's the lower end of what Holmes describes. The iodine in this claim was 10 to the minus 4. Yes. And the accused is 1.6 times 10 to the minus 4. Yes. So the idea the court relied on was 10 to the minus 4 because you go really too far off. Like, 5 times 10 to the minus 4, you're going to cry out. Well, I think it's more than that. I don't think the court was really referring to that in the district court. The district court was looking at more in the context of the sage and saying between the patentee who had a choice to choose language and the rest of the world where there's a reason there that we should essentially say to the patentee that's your range. You chose it. You chose to claim it. You only gave an example of one-tenth of where this limit line was drawn. There were no examples. It's not like I remember early in my career when we were doing something with a range, we were told to put examples  to support the various portions of the range. This only has a support in the middle and then it says, well, I'm claiming from 10 to the minus 6 up to 10 to the minus 4. In court note 7, where the court discusses sage and concentrations above the limit of the patentee but below the limit of Holmes, the court concludes because the issue is not fully developed by the parties, I do not stress my position on this point. So, that means Holmes isn't the issue? Well, I still believe that Holmes supports this position. The really, Phillips made very little in the district court of the doctrine of equivalence. There's not, they didn't make much of a case for doctrine of equivalence in the district court and we were obviously responding to what the plaintiff was saying and supporting in support of their patent. But this was claim construction. Pardon? But this was claim construction, so it's hard to say that it was abandoned when the question is what does the claim mean? It's not a matter of equivalency, it's what the claim means as written, isn't it? Yes, you're correct. Okay. Well, when you said that they didn't make much of an equivalency, I don't know if you were telling us that that issue was waived? No, I'm sorry, Your Honor, I was thinking that Judge Lori's question was in the context of the equivalence and I was responding in the context of the equivalence. Okay. Mr. Pagner, I want to ask you a question about the notice letter. Of course. The district court, of course, held that notice was not sufficient because it was written by someone on the letterhead of Phillips International, the patent owner. Correct. The letter does talk about our patents and then encloses copies of the patents and the copy of the admitted question does identify U.S. Phillips as the assignee. Isn't that enough of a representation to identify the patent? Well, first of all, I don't think it is. I don't think it satisfies the landscape, which is a bright line. Secondly, I don't recall that that issue was raised in the district court. Perhaps Mr. Reisberg can remind us if indeed it was. I don't think they even noticed that. The letter was written by a representative of the licensing arm, the corporate licensing arm for all of the sub-patents, one of which is this one. Well, compare that with poor Mr. Lanz. Mr. Lanz owned the patent and he transferred it to a wholly-owned company. Yeah, but sometimes when a defendant transfers a patent, there are disputes as to really who owns it. He has no dispute. It's a corporate parent acting for all of its subs. Well, Your Honor, I don't see that clearly here at all. Well, that's what the letter says. It refers to because our patents attaches copies of the patents and indicates we would be willing to offer a non-exclusive license and it's signed by someone who reports to be the patent portfolio manager. It seems to me even under the fairly strict bright-line test of Lanz that there is at least an identification of who the patent owner is that would be enough to satisfy the notice requirements. Well, I would submit, Your Honor, that under Lanz it does not. Poor Mr. Lanz transferred his patent to a whole young corporation. It has to IBM who said they would only deal with a company rather than with an individual inventor. And then he goes out and he wrote a letter to somebody and he said something about my patent and it wasn't his patent, it was his company's patent. And the ruling in Lanz That's the whole point. Lanz said the ownership matters. It really mattered. But IBM was a third party. IBM was a third party. You stunned me. In any event, I think it is, you know, really the point of the Lanz case is that there is a very specific statute here that it does establish a bright-line and it says the patent owner is to do something. And in this case the patent owner didn't do that something. And they also didn't do what they could have done, which was to mark their products. Okay, so Mr. Pederman, we may or may not agree on that theory, but it might help to focus the view in the remaining minute. Tell us, what is the best argument for sustaining the decision in your favor? Well, I think it comes back, in my opinion, it comes back to what I started to say at the beginning, and that is this de novo review. And the key word here is review. Our feeling is that Judge Castell did give a very... It looks like we should defer? I don't think you... Is there another argument? I don't say that you defer to a district judge because you don't. But I do say that he has proceeded correctly and spent a great deal of time and that he has perhaps expressed it better than I can in the short period of time that I have here. You've shown yourself short. Thank you. You know, I would return to the fact that I think that there are very particular reasons that have been given and are apparent from the patent to create limitations between 10 to the minus 6th and 10 to the minus 4th. And there is a reason in the history of this case of why that was done. The patentee having chosen that range, I think that the patentee should be required to abide by that range. There were possibilities if they had found you could operate outside that range within two years after issuance for example, to file a broadening reissue. They could have perhaps filed a continuation if they had found the range outside was satisfactory. But in fact, what they taught the world in their examples was that 10 to the minus 5th works. And they claimed up to 10 times that amount with no apparent support in the application. And we think that that is enough margin. I also would like to point out the strange aspect of this patent. That it is really a very poorly written patent. And I've suddenly gone from I thought green to red definition. It really is a very poorly written patent in the sense that these claims do not relate the limitation of halogen and the other limitations to the longer life which is really the supposed advantage. And it doesn't have any of the other features that are necessary to make a longer life lamp. These claims cover lamps whether they have long life or not. Thank you. Mr. Esker, you can return and tell us your best argument. In terms of the issue of claim construction, the best argument is in the words of Dr. Bergman, Iwasaki's expert. He was asked in his deposition page 836 of the record on page 22 could 10 to the minus 4 written just that way represent an order of magnitude value? And he said it could, yes. He went on to explain that he never testified that for people skilled in the art and I'm not a lamp scientist but what I understand this court's requirement to be is that we must stand in the shoes of a lamp scientist and through the eyes of a lamp scientist and ask what evidence there is about how they understand the claim. The evidence that we have from him is that he never said that we as lamp scientists write 10 to the minus 4 and 110 times 10 to the minus 4 indiscriminately. That we use one in place of the other all the time. He said something completely different. He said that to me when you write 10 to the minus 4 I understand that's an order of magnitude but I have reasons why I think that should not be applied here. And then he went on to provide reasons why he thinks it should apply primarily because of lamp example number one. I think that's the best argument in terms of why from the standpoint of one skilled in the art it would be well understood that this range of stated orders of magnitude was met that way. As to DOE, there was no amendment of this claim language at all in the prosecution district. There's no basis for any estoppel here at all. And as to the notice letter, I think the judge applied an overly restrictive, overly broad actually, application of lands. And that is dealt with a person who is not a patent owner anymore who wrote a letter claiming to own a patent. I think people in the audience in the bar would be shocked to learn that you have to be that only the patent owner itself or an employee of the patent owner can send a letter. That would mean whenever we send letters on behalf of our clients they'd be invalid because we're not employees of the patent owner. And I think that's just wrong. All rise.